**Slip Op. 99-128**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | | |
|---|---|---|
| _____ | : | |
| GSA, S.R.L., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Court No. 98-01-00112 |
| THE UNITED STATES, | : | |
| | : | Public Version |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| BORDEN FOODS CORPORATION, | : | |
| HERSHEY PASTA AND GROCERY GROUP, | : | |
| AND GOOCH FOODS, INC. | : | |
| | : | |
| Defendant- | : | |
| Intervenors | : | |
| _____ | : | |

[Commerce's decision to terminate New Shipper Review sustained.]

Dated:  December 3, 1999

Riggle and Craven (David J. Craven and David A. Riggle) for plaintiff.

David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Velta A. Melnbrencis, Assistant Director, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice (Deborah Y. Ho), and Patrick V. Gallagher, Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

**OPINION**

**RESTANI, Judge:**  This matter is before the court on the motion of plaintiff, GSA, S.r.l. ("GSA"), for judgment upon the

agency record, pursuant to USCIT Rule 56.2.  GSA seeks a remand to the International Trade Administration of the Department of Commerce ("Commerce") to reconsider certain determinations made in the termination of GSA's new shipper review.[1] Certain Pasta from Italy: Termination of New Shipper Antidumping Duty Administrative Review, 62 Fed. Reg. 66,602, 66,602-03 (Dep't Commerce 1997) [hereinafter "Review Termination"].

Specifically, GSA alleges that Commerce violated its due process rights by failing to provide it with a hearing, decided to terminate the new shipper review without substantial evidence, and failed to follow its own procedures for antidumping duty investigations.  The court will address each of these arguments in turn.

### Jurisdiction And Standard of Review

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).  New shipper review determinations are judicially

---

[1]    New shippers are defined under the Uruguay Round Agreements Act ("URAA") as exporters or producers who demonstrate in a request for a new shipper review that they: (i) did not export merchandise to the United States (or in the case of a regional industry, the region concerned) during the original period of investigation; and (ii) are not affiliated with any exporter or producer who did export merchandise to the United States (or the region concerned) during that period, including those not examined during that period.  Statement of Administrative Action ("SAA") accompanying the URAA, H.R. Rep. No. 103-826(I), 656, 875, reprinted in 1994 U.S.S.C.A.N. 3773, 4203 (1994).

reviewable  pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) (1994). The court will hold unlawful those determinations which are unsupported by substantial evidence or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

**I.    Commerce Did Not Violate GSA's Due Process Rights By Terminating The New Shipper Review Without A Hearing**

**Background**

GSA is a trading company in Italy.  Review Termination, 62 Fed. Reg. at 66,602.  GSA receives orders from its customers, arranges for the production of pasta at a factory or factories and then arranges for transportation to the appropriate customer. See Questionnaire Response to Section A (Mar. 26, 1997), at 9, C.R. Doc. 2, Def.'s App., Ex. 23, at 3.  On January 31, 1997, GSA requested that Commerce conduct a new shipper review on certain pasta from Italy.  Review Termination, 62 Fed. Reg. at 66,602. Accordingly, on February 27, 1997, Commerce initiated a new shipper administrative review for the period from July 1, 1996 through January 31, 1997.  Certain Pasta From Italy:  Initiation of New Shipper Antidumping Duty Administrative Review, 62 Fed. Reg. 8,927 (Dep't Commerce 1997).

In its response to Commerce's questionnaire, GSA related that it made sales to the United States through its U.S. affiliate, JCM, Ltd. ("JCM").  Questionnaire Response to Section

A (Mar. 27, 1997), at 17, P.R. Doc. 16, Pl.'s App., Ex. 15, at 2.

GSA identified one and only one unaffiliated producer ("Company

A")[2] from which it purchased pasta during the period of review

("POR").  Commerce Memorandum (June 13, 1997), at 1-2, C.R. Doc.

8, Def.'s App., Ex. 24, at 1-2.  GSA stated that neither GSA nor

JCM disclosed to the producer the destination of its products.

Questionnaire Response to Section A (Mar. 27 1997), at 17, Pl.'s

App., Ex. 15, at 2.

   GSA informed Commerce that a P-1 certificate was required

for shipment to the United States, and submitted a copy of such a

certificate, but explained that the certificate did not prohibit

the shipment of pasta to other locations.[3]  Questionnaire

Response to Section A (Mar. 26, 1997), at 10, Def.'s App., Ex.

23, at 4.  The P-1 certificate is imprinted at the top with the

following statement: "For Certificate IPR Exports of Pasta to the

USA."  Commerce Memorandum, at 2, Def.'s App., Ex. 24, at 2.  GSA

---

   [2]    The producer ("Company A") GSA identified was [   ].
Commerce Memorandum (June 13, 1997), at 2, C.R Doc. 8, Def.'s
App., Ex. 24, at 2.

   [3]    GSA explained that P-1 and P-2 certificates were
required for entry into the United States to comply with the
agreement between the United States and the European Community on
pasta subsidies.  Supplemental Questionnaire Response to Section
A (May 6, 1997), at 2, P.R. Doc. 26, Def.'s App., Ex. 7, at 6.
The P-1 certificate is for pasta made from wheat subject to the
inward processing regime and the P-2 certificate is for pasta
made from other wheat.  Id.

also stated that Company A obtained the P-1 and P-2 certificates for pasta GSA sold through JCM because JCM warehouses all of its pasta in the United States, regardless of the final destination. Supplemental Questionnaire Response to Section A (May 6, 1997), at 3, Def.'s App., Ex. 7, at 7.

Based on this information, Commerce questioned whether Company A knew or had reason to know the pasta sold to GSA was destined for export to the United States. Commerce Memorandum, at 2, Def.'s App., Ex. 24, at 2. Commerce therefore requested additional information from GSA regarding the packaging and the presence of the P-1 certificate. Letter from Commerce to GSA (Apr. 25, 1997), at 2, P.R. Doc. 24, Def.'s App., Ex. 6, at 2. GSA responded that its merchandise was "packaged and labeled at the time of production" and that "the 'label' is an integral part of the bag into which the product is put at the time of production." Supplemental Questionnaire Response to Section A, at 1, Def.'s App., Ex. 7, at 5.

GSA attached a photocopy of sample packaging for pasta imported into the United States that had "Imported By: Racconto, Melrose Park, IL 60160" imprinted upon it.[4] Supplemental

---

[4]     The response included a document labeled "Exhibit S-1, Sample Package Label," with an attachment containing a photocopy of packaging for pasta imprinted with such information as "RACCONTO" brand, "16 oz (1 lb) 453g," "IMPORTED BY: RACCONTO,
                                                      (continued...)

Questionnaire Response (July 18, 1997), at Ex. S-1, P.R. Doc. 38,
Def.'s App., Ex. 10, at 7.  Different name brands appeared on the
packaging for U.S. and Canadian sales.[5]  Supplemental
Questionnaire Response to Section A (May 6, 1997), at 2, Def.'s
App., Ex. 7, at 6.  GSA sold the pasta to the United States in
one package size and to Europe in another package size.[6]  Letter
from GSA to Commerce (July 18, 1997), at 4, C.R. Doc. 15, Def.'s
App., Ex. 27, at 5.

Based upon GSA's responses, Commerce recommended terminating
the new shipper review with respect to GSA.  Commerce Memorandum,
at 1, Def.'s App., Ex. 24, at 1.  Commerce determined that
Company A knew that the merchandise was destined for the United
States at the time it sold the merchandise to GSA because it had
to obtain the P-1 certificates for all shipments entering the
United States.  Id. at 4, Def.'s App., Ex. 24, at 4. Commerce

---

[4](...continued)
MELROSE PARK, IL 60160" as well as nutritional information and
cooking instructions.  Supplemental Questionnaire Response (July
18, 1997), at Ex. S-1, Def.'s App., Ex. 10, at 7.

[5]     The brand sold in Canada is [    ].  Supplemental
Questionnaire Response to Section A (May 6, 1997), at 2, C.R.
Doc. 5.  The brand sold in the United States is Racconto.
Supplemental Questionnaire Response to Section A (May 6, 1997),
at 2, Def.'s App., Ex. 7, at 6.

[6]     GSA explained that, while it sold pasta in Europe in
500 gram bags, it sold pasta in the United States in 453 gram, or
1 pound bags.  Letter from GSA to Commerce (July 18, 1997), at 4,
Def.'s App., Ex. 27, at 5.

requested comments from GSA on the recommendation to terminate. Letter from Commerce to GSA (June 20, 1997), at 1, C.R. Doc. 10, Def.'s App., Ex. 25, at 1.  In particular, Commerce asked GSA to address the possible involvement of a company ("Company B") whose name appeared on the sample packaging of pasta that GSA had attached to its supplemental questionnaire.[7]  Id. at 1, Def.'s App., Ex. 25, at 1.  GSA responded stating that Company A owned the assets and name of Company B.  Letter from GSA to Commerce (June 26, 1997), at 7, C.R. Doc. 11, Def.'s App., Ex. 26, at 4.

Commerce requested additional information from GSA regarding JCM's sales and distribution process, with a particular emphasis on whether JCM had independently purchased pasta directly from producers or trading companies other than GSA.  Letter from Commerce to GSA (July 11, 1997), at 1-2, P.R. Doc. 36, Def.'s App., Ex. 9, at 1-2.  GSA provided the names of other producers from whom JCM had purchased pasta during Commerce's original investigation, including Company A.[8]  Letter from GSA to Commerce

---

[7]    Company B's name is [    ], a manufacturer of pasta and a respondent in the original antidumping duty investigation. Letter from Commerce to GSA (June 20, 1997), at 1, Def.'s App., Ex. 25, at 1.

[8]    GSA identified four producers that were the subject of the original antidumping duty investigation but did not receive weighted-average dumping margins at that time:  Company A, [    ]. Letter from GSA to Commerce (July 18, 1997), at 5, Def.'s App., Ex. 27, at 6.

(July 18, 1997), at 5, C.R. Doc. 15, Def.'s App., Ex. 27, at 6.
GSA refused, though, to provide any cost information for Company
A because it did not control Company A or have access to that
information.  Id., at 4, Def.'s App., Ex. 27, at 5.

Commerce remained unsure that the photocopies GSA had
previously submitted were from pasta GSA had actually purchased
from Company A[9] during the POR.  Letter from Commerce to GSA
(July 11, 1997), at 2, Def.'s App., Ex. 9, at 2.  Commerce then
requested photocopies of sample packaging from the shipment of
GSA's pasta purchased from Company A during the POR and sold to
the United States.  Id.  GSA submitted another supplemental
questionnaire response, explaining that GSA could not identify
JCM's specific sales of pasta acquired directly from Company A.
Letter from GSA to Commerce (July 18, 1997), at 1, Def.'s App.,
Ex. 27, at 4.

Commerce also independently investigated Company A and its
relationship with Company B.  Commerce Memorandum to File (Oct.
20, 1997), at 1, C.R. Doc. 25, Def.'s App., Ex. 31, at 1.
Company A confirmed that it owned the name and assets of Company
B and that its export officer was the same person formerly

_____

[9]     Commerce wanted to know if Company A or B was the
producer because the original exhibit (Exhibit AS-2) submitted by
GSA in Supplemental Questionnaire Response to Section A (May 6,
1997), at Ex. AS-2, C.R. Doc. 5, had Company B's name on the
sample packaging.

employed by Company B.  Id.; see also Commerce Memorandum to File (Oct. 31, 1997), at 1, C.R. Doc. 29, Def.'s Ex. 33, at 1.

Finally, Commerce notified GSA that it had concluded that Company A knew the pasta was destined for the United States and that knowledge made it inappropriate for Commerce to review GSA's sales in a new shipper review.  Letter from Commerce to GSA (Oct. 24, 1997), at 1-2, C.R. Doc. 26, Def.'s App., Ex. 32, at 1-2. Commerce then terminated the new shipper review without holding a hearing.

## Discussion

In this matter, GSA contests Commerce's termination of a new shipper review pursuant to 19 U.S.C. § 1675(a)(2)(B) (1994).  GSA argues that Commerce violated its due process rights by failing to hold a hearing.  Additionally, GSA alleges that Commerce's decision to terminate the new shipper review is not supported by substantial evidence.

### A.    Commerce Did Not Violate GSA's Statutory Due Process Rights

GSA alleges that it is entitled to a hearing pursuant to 19 U.S.C. § 1675(e) (1994)[10] and 19 U.S.C. § 1677c(b)

---

[10]    The subsection "Hearings," provides:

Whenever the administering authority or the Commission conducts a review under this section, it shall, upon the request of an interested party, hold a hearing in

(continued...)

(1994).[11]  Both GSA and Commerce opine that GSA could not request

a hearing in this case because Commerce never published

preliminary results.  See Def.'s Br. at 31-32; Pl.'s Br. at 8.

Nevertheless, GSA argues that the right to a hearing attached in

the initial stages of the investigation and that Commerce never

afforded it the opportunity to request a hearing.  Pl.'s Br. at

10.  Thus, GSA appeals the termination of the proceedings

directly to this court and challenges Commerce's interpretation

of the statutory structure for hearings as set forth in 19 U.S.C.

§ 1675(e) and § 1677c(b).

The court, in reviewing Commerce's construction of the

statute which it administers, must first look to whether Congress

has directly spoken to the issue.  Chevron U.S.A. Inc. v. Natural

Resources Defense Council, 467 U.S. 837, 842-43 (1984).  "If the

---

[10](...continued)
accordance with section 1677c(b) of this title in
connection with that review.

19 U.S.C. § 1675(e) (1994).

[11]    The subsection "Procedures," provides:

Any hearing required or permitted under this subtitle
shall be conducted after notice published in the
Federal Register, and a transcript of the hearing shall
be prepared and made available to the public.  The
hearing shall not be subject to the provisions of
subchapter II of chapter 5 of Title 5, or to section
702 of such title.

19 U.S.C. § 1677c(b) (1994).

intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id.

The statute at issue, 19 U.S.C. § 1675(e), clearly allows any interested party to request a hearing whenever a review is being conducted.[12]  19 U.S.C. § 1675(e).  In order to claim entitlement to a new shipper review, either the producer or exporter of the merchandise at issue must satisfy the threshold requirements set forth in 19 U.S.C. § 1675(a)(2)(B)(i)(I) and (II) (1994).[13]  The statute specifically states if the administering authority receives a request from the appropriate party establishing the requirements set forth therein, then "the administering authority shall conduct a review under this subsection . . . for such exporter or producer."  19 U.S.C. §

---

[12]     Both parties have agreed that the statute allows for a hearing after a review is commenced.  See Def.'s Br. at 31-32; Pl.'s Br. at 8; see also 19 C.F.R. § 353.38(b) & (f) (1997).

[13]     The threshold requirements are as follows:

(I) such exporter or producer did not export the merchandise that was the subject of an antidumping duty or countervailing duty order to the United States . . .during the period of investigation, and
(II) such exporter or producer is not affiliated (within the meaning of section 1677(33) of this title) with any exporter or producer who exported the subject merchandise to the United States . . . during that period.

19 U.S.C. § 1675(a)(2)(B)(i)(I) and (II).

1675(a)(2)(B)(i) (emphasis added).  The statute makes clear, by its language, that the right to a review attaches only after the correct party requesting the review has established that it is a new shipper.  The right to hearing would follow only after Commerce commenced a review under 19 U.S.C. § 1675(a)(2)(B).

In this case, Commerce only conducted a preliminary investigation to determine if GSA was the correct party to request a review.  Commerce never determined if GSA established all the criteria to qualify as a new shipper entitled to a review.  As discussed further in the following section, Commerce terminated the new shipper review without holding a hearing because it determined that GSA was not the correct respondent. Review Termination, 62 Fed. Reg. at 66,602-603. The question remaining for the court to address is whether Commerce properly concluded that GSA was not the correct party to request a new shipper review.

### B.    Substantial Evidence Supports Commerce's Termination of the New Shipper Review

Commerce's determination that GSA failed to establish that it was the correct party before Commerce is supported by substantial evidence and is in accordance with the law.  To commence a new shipper review, GSA had to establish that it, as the exporter (and not the producer), was the correct party before

Commerce.  The court must therefore decide if Commerce reasonably interpreted the term "exporter or producer" in determining the proper party entitled to a new shipper review.

In 19 U.S.C. § 1675(a)(2)(B), it clearly states that the request for a new shipper review must come from an "exporter or producer."   The statute defines exporters and producers as follows:

> The term "exporter or producer"  means the exporter of the subject merchandise, the producer of the subject merchandise, or both where appropriate.  For purposes of section 1677b of this title, the term "exporter or producer" includes both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise.

19 U.S.C. § 1677(28) (1994).  The statute is silent as to what constitutes an individual exporter or producer.  AK Steel Corp. v. United States, 34 F. Supp.2d 756, 764 (Ct. Int'l Trade 1998). Where a statute is silent or ambiguous, the court defers to Commerce's reasonable interpretation of its statutory mandate. Id. (citing Chevron, 467 U.S. at 842-43).  The court concludes that Commerce properly interpreted the term "exporter or producer" in 19 U.S.C. § 1675(a)(2)(B) based on its export price analysis.

Commerce concluded that it must assess the normal value and export price or constructed export price before proceeding to calculate the weighted average dumping margin for any subject merchandise. 19 U.S.C. § 1675(a)(2)(A) (1994). In this case, Commerce decided that export price and not constructed export price would be used to establish the weighted-average dumping margin. Def.'s Br. at 25. Export price is defined as follows:

> The term "export price" means the price at which the subject merchandise is <u>first</u> sold . . . before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser inside the United States or to an unaffiliated purchaser for exportation to the United States . . .

19 U.S.C. § 1677a(a) (1994)(emphasis added). GSA is the first unaffiliated purchaser for exportation to the United States. To use GSA's sales price for exportation to the United States, GSA's producer (Company A) must not know that the merchandise was destined for the United States.[14] If Company A knew the pasta

_____

[14] Commerce has properly established that the producer's sale price shall be used if the producer knows the destination of the merchandise is the United States. This requirement is commonly known as the "knowledge test." Congress anticipated the knowledge test when it defined "purchase price" as the price the producer charged for the goods if the "producer knew or had reason to know the goods were for sale to an unrelated U.S. buyer." Statement of Administrative Action accompanying the Trade Agreements Act of 1979, H.R. Rep. No. 4537, 388, 411, <u>reprinted in</u> 1979 U.S.S.C.A.N. 665, 682. Since 1979, the statute has been modified to change the term "purchase price" to "export

(continued...)

was destined for the United States, then the sale which determines the export price would be Company A's sale to GSA.

Commerce determined that Company A knew that the pasta at issue was destined for U.S. markets and was manufactured by a respondent in a prior antidumping duty investigation that had its own dumping margin. Commerce Memorandum Recommending Termination (Nov. 23, 1997), at 2, C.R. Doc. 31, Def.'s App., Ex. 34, at 2; see also Letter from Commerce to GSA (June 20, 1997), at 1, Def.'s App., Ex. 25, at 1. There was sufficient evidence for Commerce to reach that conclusion. First, Company A prepared the P-1 certificate that stated "For Certificate IPR Exports of Pasta to the USA." Commerce Memorandum, at 2, Def.'s App., Ex. 24, at 2. Second, Company A manufactured the labeling and packaging for the pasta with the information "Imported by Racconto, Melrose Park, IL 60160" imprinted upon it. Supplemental Questionnaire Response to Section A (May 6, 1997), at 1, Def.'s App. Ex.7, at 5; Supplemental Questionnaire Response (July 18, 1997), at Ex. S-1, Def.'s App., Ex. 10, at 7. Third, two different package sizes were used for the United States and Europe. Letter from GSA to

---

[14](...continued)
price," to conform U.S. law to the URAA, without changing the meaning or interpretation of the term. SAA accompanying the URAA at 79, reprinted in 1994 U.S.S.C.A.N. at 3851 ("The change is made to conform U.S. law more specifically to the provisions of the Agreement").

Commerce (July 18, 1997), at 4, Def.'s App., Ex. 27, at 5.

Fourth, different brands were sold in the United States and

Canada.  Supplemental Questionnaire Response (May 6, 1997), at 2,

Def.'s App., Ex. 7, at 6.

Finally, the packaging that GSA submitted as representative

of pasta sold for export to the United States and Canada

identified Company B as the producer.  Supplemental Questionnaire

Response to Section A (May 6, 1997), at Ex. AS-2, C.R. Doc. 5.

Prior to Company A acquiring Company B's name and assets, Company

B directly produced and packaged Racconto brand pasta for sale to

JCM, GSA's U.S. affiliate, which was doing business as Racconto.

Commerce Memorandum Recommending Termination, at 4-5, Def.'s

App., Ex. 34, at 4-5.  Company A, after acquiring Company B's

assets and name, employed the same export-import officer used by

Company B at the same factory originally owned by Company B.[15]

Commerce Memorandum to File (Oct. 31, 1997), at 1, Def.'s App.,

Ex. 33, at 1.  Thus, Company A learned that the pasta was

_____

[15]     GSA attempts to cast doubt upon the conclusions drawn
from evidence that it submitted or that Commerce independently
investigated.  Neither argument has merit.  Additionally, even if
GSA succeeded in casting some doubt upon the conclusions, it
would not be a sufficient basis to overturn Commerce's decision.
Nihon Cement Co. v. United States, 17 CIT 400, 407 (1993) (citing
Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966))
("The possibility of drawing two inconsistent conclusions from
the evidence does not prevent the agency's finding from being
supported by substantial evidence.")

destined for the United States from the packaging, obtaining the P-1 or P-2 certificates for exporting the pasta, its acquisition of Company B and its export-import officer and JCM's independent purchases from Company B under the same brand name used by GSA. Supplemental Questionnaire Response (July 18, 1997), at Ex. S-1, Def.'s App., Ex. 10, at 7; Commerce Memorandum, at 2, Def.'s App., Ex. 24, at 2; Commerce Memorandum Recommending Termination, at 4-5, Def.'s App., Ex. 34, at 4-5; Letter from GSA to Commerce (July 18, 1997), at 5, Def.'s App., Ex. 27, at 6.

Because Commerce properly concluded that Company A knew the pasta was destined for the United States, the price it charged GSA is the correct price for calculating export price. GSA is no longer the correct respondent before Commerce. The price at which GSA sold the pasta was irrelevant for the purposes of 19 U.S.C. § 1675(a)(2)(B). Thus, Commerce's termination of the new shipper review is supported by substantial evidence and is affirmed for the reasons stated herein.

## II.  Commerce Did Not Fail to Comply With Its Procedures

### Background

GSA made several procedural protests as Commerce investigated GSA's claimed new shipper status. GSA complained to Commerce that Borden Foods Corporation, Hershey Pasta and Grocery Group and Gooch Food, Inc. (the "domestic producers") in a

September 26, 1997 letter to Commerce included confidential information without a request for confidential treatment pursuant to 19 C.F.R. § 353.32(a) (1997).  Letter from GSA to Commerce (Oct. 9, 1997), at 2-3, P.R. Doc. 56, Def.'s App., Ex. 12, at 2-3.  Commerce responded that the submissions complained of consisted of comments on GSA's responses.  Letter from Commerce to GSA (Oct. 30, 1997), at 1, P.R. Doc. 66, Def.'s App., Ex. 17, at 1.  Furthermore, Commerce explained that once information had been accorded proprietary treatment, those parties who are subject to the administrative protective order ("APO") may refer to such information in their submissions as long as it is properly bracketed and identified as proprietary information. Id.

    Commerce also held an *ex parte* meeting with the domestic producers regarding their September 26, 1997 submission to the agency.  Commerce's Memorandum to File (Oct. 22, 1997), at 1, P.R. Doc. 59, Def.'s App., Ex. 13, at 1.  GSA alleged that Commerce inadequately documented this meeting by failing to state the location of the meeting place and by failing to provide a summary of the facts presented.  Letter from GSA to Commerce (Oct. 29, 1997), at 2-3, P.R. Doc. 63, Def.'s App., Ex. 14, at 2-3.  Commerce responded by identifying the meeting location as the main Commerce building and by explaining that no facts were

presented and that the topic of discussion was legal issues, specifically, the "legal arguments concerning the appropriate basis for calculating normal value and constructed export price in this case." Letter from Commerce to GSA (Nov. 23, 1997), at 1-2, P.R. Doc. 70, Def.'s App., Ex. 20, at 1-2.

On two occasions in the course of the new shipper review, the domestic producers submitted comments without certificates of accuracy.[16] Letter from Borden to Commerce (July 10, 1997), P.R. Doc. 35, Def.'s App., Ex. 8 (responding to GSA's June 27, 1997 submission to Commerce regarding P-1 export certificates and Canadian product labeling requirements); Letter from Borden to Commerce (Oct. 29, 1997), P.R. Doc. 65, Def.'s App., Ex. 16 (responding to Commerce's October 24, 1997 request for comments on its decision to terminate GSA's new shipper review). Commerce responded that the domestic producers' submissions were comments on GSA's responses to Commerce's requests for information, that the proprietary information belonged to GSA and that the domestic producers therefore were not required to re-certify the information pursuant to 19 C.F.R. § 353.32 for either of the

---

[16]    The parties do not contest the fact of these submissions or that they were submitted without certificates of accuracy. The certification requirements is set forth infra, note 17.

domestic producers' submissions.  Letter from Commerce to GSA
(Oct. 30, 1997), at 1-2, Def.'s App., Ex. 17, at 1-2.

On December 19, 1997, Commerce terminated the new shipper
review of GSA, citing the reasons previously expressed in its
letters and memorandum.  Review Termination, 62 Fed. Reg. at
66,602.

## Discussion

As indicated, GSA alleges several procedural violations: (i)
that Commerce failed to require the domestic producers to submit
certificates of accuracy; (ii) that Commerce failed to require
the domestic producers to comply with the requirements of
confidential treatment for proprietary information; and (iii)
that Commerce held improper *ex parte* meetings and failed to
properly document such meetings.  The court will address each of
these arguments in turn.

### A.    Failure to Require Certificates of Accuracy is Harmless Error

GSA claims Commerce erroneously accepted and relied upon
factual material submitted without the required certificates of
accuracy, pursuant to 19 C.F.R. § 353.31(i) (1997).[17]  There is

---

[17]    Under the heading, "Certifications," the regulation
provides as follows:

Any interested party which submits factual information
to the Secretary must submit with the factual

(continued...)

no dispute among the parties that the regulations require certificates of accuracy to accompany factual submissions to the agency. The parties differ, though, as to whether the submissions at issue contained factual material requiring certification. In reviewing the two submissions by the domestic producers, the court finds that the domestic producers primarily provided comments on GSA's submissions, as Commerce contends. See Letter from Borden to Commerce (July 10, 1997), Def.'s App., Ex. 8; Letter from Borden to Commerce (October 29, 1997), Def.'s App., Ex. 16; and Def.'s Br. at 36-37.

Nevertheless, the domestic producers made two independent factual submissions without certifications of factual accuracy. First, the domestic producers proffered the "Guide to Food Labelling [sic] and Advertising prepared in March 1996 by Agriculture and Agri-Food Canada." Letter from Borden to Commerce (July 10, 1997), at 2, Def.'s App., Ex. 8, at 2. Second, the domestic producers asserted that "the Racconto brand is a brand name exclusively used by GSA in the United States [and

---

[17](...continued)
information the certification in paragraph (i)(1) and, if the party has legal counsel or another representative, the certification in paragraph (i)(2) of this section.

19 C.F.R. § 353.31(i) (1997). The subsections following provide form language to be used in such certifications.

that] GSA's sales in the Italian market, and in other third-country markets, are under brand names other than Racconto." Letter from Borden to Commerce (October 29, 1997), at 3, Def.'s App., Ex. 16, at 3.  Clearly these fact statements require certification as set forth in 19 C.F.R. § 353.31(i).

In reviewing Commerce's failure to require certification, the court notes that "[i]t is well settled that principles of harmless error apply to the review of agency proceedings." Intercargo Ins. Co. v. United States, 83 F.3d 391, 394 (Fed. Cir. 1996); Sea-Land Serv., Inc. v. United States, 14 CIT 253, 257, 735 F. Supp. 1059, 1063 (1990) (it is "well settled that courts will not set aside agency action for procedural errors unless the errors 'were prejudicial to the party seeking to have the action declared invalid'") (citations omitted), aff'd and adopted, 923 F.2d 838 (Fed. Cir. 1991).  In this case, Commerce based its decision to terminate the new shipper review on the facts submitted by GSA and the facts determined by its own investigation.  Commerce Memorandum Recommending Termination, at 2-3, Def.'s App., Ex. 34, at 2-3.  It appears none of the facts submitted by the domestic producers were considered by Commerce in drawing its conclusions.  Id.  Commerce only mentioned the domestic producers to say that they concurred with its conclusion.  Id. at 4, Def.'s App., Ex. 34, at 4.  Furthermore,

GSA failed to allege that such information was actually used in Commerce's decision or even that GSA was somehow prejudiced.  <u>See</u> Pl.'s Br. at 16-17.  The court concludes that Commerce's error was harmless.

GSA further argues that the Commerce's failure to return the improper submissions should result in a reversal of Commerce's decision.  Pl.'s Br. at 17.  GSA incorrectly relies on 19 C.F.R. § 353.32(d) (1997), which requires the return of information for which a submitter's request for proprietary treatment is not granted.[18]  19 C.F.R. § 353.32(d) (1997).  The submissions that GSA objected to contained no information for which proprietary treatment was requested.  <u>See</u> <u>Letter from Commerce to GSA</u> (Oct. 30. 1997), at 1-2, Def.'s App., Ex. 17, at 1-2.  Therefore, the regulation is inapplicable.

**B.    Commerce Treated Confidential Submissions Properly**

GSA complains that the domestic producers should have requested confidential treatment for information in its

---

[18]    The Code of Federal Regulations requires the return of information as a result of a <u>nonconforming request for proprietary treatment</u>:

> The Secretary may return to the submitter any factual information for which the submitter requested proprietary treatment when the request does not conform to the requirements of this section and in any event will not consider the information.

19 C.F.R. § 353.32(d) (1997).

submissions.  Pl.'s Br. at 18-23.  Commerce counters that GSA submitted the information with a request for proprietary treatment and that the domestic producers therefore did not need to request proprietary treatment.  Def.'s Br. at 38-40.  As the proprietary information had already been submitted to the agency with a request for confidential treatment, and its subsequent submission conformed to the procedures for referring to information protected by administrative order, the court affirms the agency's decision not to reject the submission.[19]

In deciding that its regulation did not preclude consideration of the submitted material in this case, Commerce was not, as GSA suggests, promoting a definition of the term "submitter" that is absurd or at odds with other uses of the term within the agency's regulations.  Pl.'s Br. at 21. Commerce defined submitter in the context of 19 C.F.R. § 353.32(a) as the one who first submits the factual material with a request for confidential treatment.  Letter from Commerce to GSA (Oct. 30,

---

[19]     Under the heading, "Request for proprietary treatment of information," the regulation provides, in relevant part,

(a) *Submission and content of request.*
(1) Any person who submits factual information to the Secretary in connection with a proceeding may request that the Secretary treat that information, or any specified part, as proprietary.

19 C.F.R. § 353.32(a)(1) (1997).  Subsections § 353.32(a)(2) and (3) detail the procedures to be followed with regard to such submissions.

1997), at 1, Def.'s App., Ex. 17, at 1.  The court looks to the administrative construction of the regulation and accepts such construction as controlling unless it is plainly erroneous or inconsistent with the regulation.  <u>Udall v. Tallman</u>, 380 U.S. 1, 16-17 (1965) (citation omitted).

Commerce simply read the term in the context of the regulation and acted consistently with the plain meaning and purpose of the regulation.  Moreover, Commerce has not acted unreasonably in effectively choosing to require only the party first submitting confidential information to request confidential treatment.  A contrary interpretation would unduly burden the agency with repetitive requests upon successive references to the same information.  The court therefore affirms Commerce's interpretation of the term "submitter."

### C.   Commerce Interpreted C.F.R. § 353.35 Reasonably

GSA objected to Commerce having heard legal arguments at an *ex parte* meeting with the domestic producers.  Commerce admits having done so but defends the practice.  In 19 C.F.R. § 353.35 (1997), the regulations provide that Commerce must maintain a record of *ex parte* meetings in which factual information is gathered.[20]  The regulation does not refer to the *ex parte*

---

[20]    The regulation provides:

(continued...)

entertainment of legal arguments.  Commerce interprets this

silence as a license to hear *ex parte* legal arguments in the

course of its review.  Def.'s Br. at 34.  Because the Code of

Federal Regulations is silent on the question, the court defers

to this reasonable interpretation by Commerce of its statutory

mandate.  See Udall, 380 U.S. at 16-17.

GSA argues that the provisions of the Administrative

Procedure Act (the "APA") govern where Commerce's regulations are

either unclear or silent.  Pl.'s Reply Br. at 11-12.  Contrary to

GSA's assertion, the APA does not apply to antidumping

administrative proceedings.  First, hearings in antidumping

matters are not governed by the APA.  See 19 U.S.C. § 1677c(b)

(providing that an administrative hearing "shall not be subject

to the provisions of subchapter II of chapter 5 of title 5, or to

section 702 of [the APA]").[21]  Second, Commerce's position is

---

[20](...continued)
The Secretary will prepare for the official record a
written memorandum of any *ex parte* meeting between any
person providing factual information in connection with
a proceeding . . .  The memorandum will include the
date, time, and place of the meeting, the identity and
affiliation of all persons present and a public summary
of the factual information presented.

19 C.F.R. § 353.35 (1997).

[21]    Nonetheless, the statutory scheme provides a framework
for fair decisionmaking and had GSA not been provided an
(continued...)

bolstered by the nature of the proceedings, which are largely investigative, not adjudicatory.  SAA accompanying the URAA at 892, reprinted in 1994 U.S.S.C.A.N. at 4215-216 (1994) ("[A]ntidumping and countervailing proceedings . . . are investigatory in nature."); see also Monsanto Co. v. United States, 12 CIT 937, 947, 698 F. Supp. 275, 283 (1988) (noting that "agency actions which are being reviewed might be best described as quasi-adjudicatory, quasi-investigatory" and finding that if Commerce acts in an investigatory capacity, "constitutional due process concepts seem out of place").  Thus, the rights granted in the course of an adjudicatory proceeding do not necessarily attach when Commerce is engaged in the investigatory stages of a proceeding.  The court concludes that Commerce interpreted its regulation reasonably.

---

[21](...continued)
opportunity to present its own arguments, the court might compel Commerce to consider them, but the *ex parte* meetings did not interfere with GSA's opportunity to make its case.

## Conclusion

The court sustains Commerce's decision to terminate GSA's new shipper review.

_____
Jane A. Restani
Judge


DATED:     New York, New York

           This    day of December, 1999.